**Keith H. TAYLOR, Plaintiff,**

**v.**

**DAIMLERCHRYSLER AG, Defendant.**

**No. 00–75350.**

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 13, 2003.

---

Richard L. Mayer, Michael J. Lennon, Jeffrey M. Butler, Mark A. Hannemann, and Paul T. Qualey, all of Kenyon & Kenyon, New York, NY, and Marjory G. Basile of Miller, Canfield, Paddock & Stone, Detroit, MI, were counsel for defendant DaimlerChrysler AG.

Michael H. Baniak and Jeffrey A. Pine of Baniak, Pine & Gannon, and Andrew Kochanowski of Sommers, Schwartz, Silver & Schwartz, Southfield, MI, were counsel for plaintiff Keith H. Taylor.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

COHN, District Judge.

### I. Introduction

This is a patent case. Plaintiff Keith H. Taylor (Taylor), holder of U.S. Patent No. 4,821,019 (the '019 patent) covering a Mirror Assembly Including An Image Forming Lamp, is suing DaimlerChrysler AG (DCAG) for infringement in the making, etc., of Mercedes–Benz automotive mirror assemblies (DCAG mirror assembly)[1] which fall within the scope of one or more of the claims of the '019 patent. At this time the sole claim in issue is claim 1, from which all other claims in the '019 patent depend. The Court previously held a *Markman* hearing to construe two of the limitations in claim 1.

Before the Court is DCAG's renewed motion for summary judgment of noninfringement.[2] DCAG argues that its mirror assembly does not literally infringe the '019 patent because it does not meet the following limitations of claim 1:

---

1. Although Taylor says that numerous models of Mercedes–Benz automotive mirror assemblies infringe the '019 patent, the Court will refer to the allegedly infringing products collectively because the parties agree that each model possesses the same basic structure.

2. The Court held a hearing on the motion on October 2, 2003.

1. A mirror assembly (10) comprising:

a translucent housing (12) including a plastic shell being substantially cup shaped and having an open end and a closed end ...

said wall and said closed end and containing and concealing illuminating image forming means within said housing (12) and preventing incident light from passing therethrough ...

. . . . .

said illuminating image forming means (26) ... hidden from view from outside said housing (12) ....

DCAG says that its mirror assembly has an opaque housing with a translucent lens mounted in one end of the housing. DCAG argues that the lamp-and-lens turn-signal assembly in the DCAG mirror assembly is always visible and allows incident light to pass through the lens. DCAG further says that Taylor is estopped from asserting infringement under the doctrine of equivalents.

Taylor responds that, properly construed, the DCAG mirror assembly contains structure corresponding to each of the claim elements at issue. Taylor also says that prosecution history estoppel does not apply because none of the claim elements at issue were amended to overcome the prior art.

For the reasons that follow, DCAG's motion is GRANTED. The DCAG mirror assembly does not literally infringe claim 1 of the '019 patent and Taylor is estopped from asserting infringement under the doctrine of equivalents.

## II. Background

### A. The '019 Patent

The ABSTRACT of the '019 patent describes the invention:

A mirror assembly (10) including a housing (12) having a translucent portion, mirror mechanism (20) retained by the housing (12), and an illuminating image forming mechanism (26) mounted within the housing (12) and behind the mirror mechanism (20) for projecting an image through the translucent portion.

Figure 4 illustrates the invention:

Fig-4

The BACKGROUND ART describes the advance in the art as follows:

Generally, prior art mirror assemblies include a housing which encloses a mirror and the mechanical operations therefor, and means for connecting the housing to an automobile. The mirror may be operable through a push pull mechanism or by electronic means.

Some prior art mirrors include additional means for providing an image on the forwarding facing portion of the housing. For example, the U.S. Pat. Nos. 1,874,027 to Condon, issued Aug. 30, 1932; 2,580,014 to Gazda, issued December 25, 1951; and 2,595,331 to Calihan et al, issued May 6, 1952 all disclose mirror assemblies wherein the mirror assembly is a combined driving mirror, parking and signal device. In each of the signaling devices, an image is formed by a lens shaped in the form of the image mounted on the mirror housing to indicate the signal. For example, the Condon patent discloses a mirror housing including a mirrored panel which is either cut away or silvered to form a desired configuration, such as an arrow. The Gazda patent likewise discloses a housing including a plate of lucite forming an arrow. The Calihan et al patent discloses a combination vision mirror and signaling device including a housing having a central longitudinal portion of a transparent or translucent element and a light source within the housing. In each of the aforementioned prior art patents, an assembly is disclosed wherein the image forming means is the housing per se and a light source is provided within the housing. Whether illuminated or not, the image is shown on the housing.

It is desirable in view of present day styling to provide a mirror housing which is aerodynamically designed and an esthetically pleasing. The present invention provides such an assembly wherein a lighted image is projected through a mirror housing. When not illuminated, the image cannot be detected.

Claim 1 of the '019 patent (broken down into appropriate clauses) reads:

1. A mirror assembly (10) comprising:

a translucent housing (12) including a plastic shell being substantially cup shaped and having an open end and a closed end and a wall extending from said closed end,

said wall and said closed end and containing and concealing illuminating image forming means within said housing (12) and preventing incident light from passing therethrough while only revealing an illuminated image through at least one of said well and closed end projected from the illuminating image forming means;

mirror means (20) retained by said housing (12) within and adjacent to said open end; and

said illuminating image forming means (26) mounted within said housing (12) adjacent at least one of said closed end and wall and completely behind said mirror means (20) so as to be hidden from view from outside said housing (12) and said mirror means (20) for projecting only said illuminated image through at least one of said wall and closed end of said shell (12).

## B. The *Markman* Hearing

The Court held a *Markman* hearing on May 27, 2003. The Decision on Claim Construction which followed interpreted "wall extending from said closed end" and identified the proper structure for the "illuminating image forming means" means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.

The "wall extending from said closed end" was interpreted as follows:

> "Open end" and "closed end" are not structural elements but rather the orientation of the described structure: a "translucent housing." The "wall extending from the closed end" is clearly the forward facing portion of the closed end of the housing and is shown on the drawings as 14.

> If the case goes to a jury it will be told that:

> The wall is the forward facing portion of the translucent housing and is shown on the drawings as 14.[3]

Regarding the "illuminating image forming means," the Court agreed with Taylor's identification of the function and corresponding structure from the specification:

> The function of the illuminating image forming means is to project only the illuminated image through the housing.

> The corresponding structure includes:

> 1. a) a lamp;
> b) a substantially opaque form placed between the lamp and the housing; and
> c) control means for selectively actuating the lamp means; or
> 2. a) an image shaped lamp member, which may include an electroluminescent lamp of almost any size, shape or color; and
> b) control means for selectively actuating the lamp means; or
> 3. any other lamp means which forms an illuminated image of sufficient density to be seen through the housing shell; or any equivalents thereof.[4]

## C. Procedural Background

DCAG filed its renewed motion for summary judgment of noninfringement on April 24, 2003. Taylor filed a response on May 19, 2003 and then filed a supplemental response on June 20, 2003 after the *Markman* hearing. DCAG filed a reply on July 2, 2003. The Decision on Claim Construction followed.

Taylor argues that DCAG's motion is a waste of time and should be denied because the parties' papers were filed prior to the Decision on Claim Construction. Despite the somewhat unusual sequence of filings, DCAG's motion is ready for decision because DCAG does not dispute that its mirror assembly contains the two limitations discussed in the *Markman* decision.

## III. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Pe-*

---

**3.** *See* Decision on Claim Construction (August 21, 2003), at 15.

**4.** *See* Decision on Claim Construction (August 21, 2003), at 17–18, Ex. A.

*troleum Specialties, Inc.,* 69 F.3d 98, 101 (6th Cir.1995). Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. *Thompson v. Ashe,* 250 F.3d 399, 405 (6th Cir.2001). If a nonmoving party cannot establish a genuine issue for trial on any essential element of her claim, then the moving party is entitled to summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Claim Construction [5]

██ Claim construction is a matter of law for the Court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Federal Circuit has clearly explained the steps of the claim construction process:

First, we look to the words of the claims themselves, both asserted and noasserted, to define the scope of the patented invention. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.

Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication . . . . The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

Third, the court may also consider the prosecution history of the patent, if in evidence. This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein.

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) (citations omitted).

### C. Infringement Generally

██ The infringement inquiry requires a comparison of the asserted claim with the allegedly infringing device. *Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1359 (Fed.Cir.2000). To prove infringement, the patentee must establish that the accused device contains each limitation of the asserted claim, *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998), or an equivalent of each limitation, *Warner–Jenkinson Co. v., Hilton Davis Chemical Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The determination of infringement, both literal and under the doctrine of equivalents, is a question of fact. *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1323 (Fed.Cir.2002).

**5.** Claim construction must be revisited.

## D. Literal Infringement

■ Literal infringement requires that the accused device embody exactly each limitation of the asserted claim. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991).

## E. Prosecution History Estoppel

■ Prosecution history estoppel can prevent a patentee from asserting as an equivalent subject matter surrendered during prosecution of the patent application. *See generally Allen Eng'g. Corp. v. Bartell Indus. Inc.*, 299 F.3d 1336, 1349–50 (Fed.Cir.2002). "Estoppel arises when an amendment is made to secure allowance of the patent and the amendment narrows the patent's scope." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). In *Festo*, the Supreme Court explained the relationship between the doctrine of equivalents and prosecution history estoppel, making clear that application of the latter does not operate as a complete bar to application of the former:

> A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim. *Exhibit Supply v. Ace Patens Corp.*, 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736 (1942), ("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference"). There are some cases, however, where the amendment cannot reasonably be viewed as surrendering a particular equivalent. The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there may be some other reason suggesting that the patentee could not reasonably

> be expected to have described the insubstantial substitute in question. In those cases the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence.

> This presumption is not, then, just the complete bar by another name. Rather, it reflects the fact that the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims. When the patentee has chosen to narrow a claim, courts may presume the amended text was composed with awareness of this rule and that the territory surrendered is not an equivalent of the territory claimed. In those instances, however, the patentee still might rebut the presumption that estoppel bars a claim of equivalence. The patentee must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.

*Festo*, 535 U.S. at 740–41, 122 S.Ct. 1831.

■ "Whether or not prosecution history estoppel precludes a particular action for infringement by equivalents is a question of law." *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1319 (Fed.Cir.2000).

Additionally, as one district court has said:

> The patentee bears the burden of overcoming a presumption that narrowing amendments are made for reasons of patentability. If the Court finds that [the applicant] filed the requisite amendment, then the Court proceeds to the second step: determining whether the amendment "surrender[ed] the particular equivalent in question." "A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the

amended claim." The patentee must overcome the presumption that "the patentee surrendered all subject matter between the broader and narrower language."

. . . . .

The heartland issue is whether [the amendments to the] patent application surrendered the alleged equivalent . . . . ("[T]he patentee should bear the burden of showing that the amendment d[id] not surrender the particular equivalent in question."). [The applicant] can overcome this presumption by showing [the infringing device] was "unforeseeable at the time of the application," or that "the rationale underlying the amendment . . . bear[s] no more than a tangential relation to the equivalent in question," or "some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question."

*SoundTube Entertainment, Inc. v. Brown Innovations, Inc.*, 233 F.Supp.2d 188, 195–96 (D.Mass.2002) (internal citations omitted); *see BEI Techs., Inc. v. Matsushita Elec. Indus. Co.*, 268 F.Supp.2d 782, 800–02 (E.D.Mich.2003) (patentee has the burden of showing that the alleged equivalent was "unforeseeable at the time of the application, i.e. there is a reason why a person skilled in the art would not reasonably have been expected to draft a claim to literally cover the accused equivalent at that time").

■ On remand from the Supreme Court, the Federal Circuit further explained the three ways in which a patentee can rebut the *Festo* presumption that all territory between the original limitation and the amended limitation was surrendered. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369–70 (Fed.Cir.2003). First, the patentee can demonstrate that the alleged equivalent was objectively unforeseeable to one of

ordinary skill in the art at the time of the amendment. *Id.* at 1369. Expert testimony and extrinsic evidence may be used to determine if the alleged equivalent was unforeseeable. *Id.* Second, the patentee can show that the objectively apparent reason for the amendment was only tangentially related to the alleged equivalent. *Id.* The second method of rebutting the *Festo* presumption must be "determine[d] from the prosecution history record without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record." *Id.* at 1370. Third, there may be some other reason why the patentee could not have described the equivalent in question, such as "the shortcomings of language." *Id.* Only the prosecution history may be examined "[w]hen at all possible." *Id.*

## F. Infringement by Equivalents

■ Infringement under the doctrine of equivalents requires that the accused device contain each limitation of the asserted claim or its equivalent. *See Warner–Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040 (1997) (noting that because each limitation contained in a claim is material to defining the scope of the patented invention, the doctrine of equivalents analysis must be applied to individual claim limitations, not to the invention as a whole). An element in the accused device is equivalent to a claim limitation if the differences between the two are "insubstantial" to one of the ordinary skill in the art. *See id.* Relevant to an insubstantial difference inquiry is whether the missing element in the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the asserted claim limitation. *Graver Tank & Mfg. Co. v. Linde Air Prods., Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *see also Warner–Jenkinson*, 520 U.S. at 39–40, 117 S.Ct. 1040.

## IV. Analysis

■ As noted in the Introduction, DCAG argues that its mirror assembly does not embody five limitations of claim 1:

(1) "translucent housing,"

(2) "closed end,"[6]

(3) "containing and concealing illuminating image forming means within said housing,"

(4) "preventing incident light from passing therethrough while only revealing an illuminated image," and

(5) "illuminating image forming means ... hidden from view from outside said housing."

The parties do not dispute the basic physical structure of the accused DCAG mirror assembly. Rather, the parties attach different meanings to the limitations and disagree over what parts of the DCAG mirror assembly correspond to each of the limitations. When "the question of literal infringement collapses to one of claim construction," summary judgment is particularly appropriate. *Athletic Alternatives v. Prince Mfg.*, 73 F.3d 1573, 1578 (Fed.Cir. 1996). The Court must decide the precise meaning of the claim limitations at issue and then determine whether the claim as construed reads on the accused mirror assembly. *Id.*

### A. "Translucent Housing"

#### 1. Claim Construction Redux[7]

■ Taylor argues that "translucent housing" is properly construed as a "housing having a translucent portion." DCAG argues that "translucent housing" means a housing that is entirely translucent. Because it was not identified for construction in the *Markman* proceeding, the Court must now construe the term as a matter of law before conducting an infringement analysis.

First, the exact meaning of "housing" must be determined. Claim 1 requires "a translucent housing (12) including a plastic shell being substantially cup shaped and having an open end and a closed end and a wall extending from said closed end." The wall, or, the forward facing portion of the housing, contains and conceals the illuminating image forming means, which is mounted within the housing. The mirror means is "retained by" the housing at the open end. Hence, "housing" is simply defined by the function it performs. The housing is a structure that contains the illuminating image forming means inside it and connects to the mirror mechanism at the open end.

The next issue is whether "translucent"[8] refers to the entire housing or to only a

---

6. DCAG disputed the "closed end" limitation for the first time at the hearing. For the reasons stated below, DCAG's argument that its mirror assembly does not have a "closed end" is without merit.

7. Why all this was not raised in the *Markman* proceeding is not explained.

8. The surface of an object can be transparent, translucent, or opaque. These terms mean the following:

**transparent:** Having the property of transmitting light, so as to render bodies lying beyond completely visible; that can be seen through.

**translucent:** Allowing the passage of light, yet diffusing it so as not to render bodies lying beyond clearly visible; semi-transparent.

**opaque:** Impermeable to light, not transmitting light, not transparent; hence, impenetrable to sight.

Oxford English Dictionary (2d ed.1989), *available at OED Online* <http://dictionary.oed.com>. The Federal Circuit has not specified a particular dictionary to use in ascertaining ordinary meaning. *See E–Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1367 (Fed.Cir.2003) (citing definitions from Merriam–Webster's Collegiate Dictionary, Random House Webster's Unabridged Dictionary, and the Oxford English Dictionary).

portion of the housing. The first step, obviously, is to look at the plain language of the claim itself. *Vitronics*, 90 F.3d at 1582 (words in a claim are "generally given their ordinary and customary meaning" unless the specification or prosecution history clearly show that some other meaning is intended). "Housing" is directly modified by the adjective "translucent." The ordinary reading when such language is used is that the entire structure must possess the stated quality. *See Saeilo, Inc. v. Colt's Mfg. Co.*, 26 Fed. Appx. 966, 970 (Fed.Cir.2002) (unpublished) ("The claim language requires only that the 'lug' be laterally offset from the bore axis. Between 'the entire lug' and 'a portion of the lug,' we think the former is the more natural reading of the plain term 'lug.' When language is used precisely and naturally, a piece or portion of a lug is not a 'lug.'"); *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195 (Fed.Cir.1999) ("Claim 1 clearly indicates that the 'special quality' for which a signal is selected is whether or not that signal has passed through an irregularity. There is no indication in the plain meaning of the limitation, or from the claim as a whole, that this selection criterion is to apply only some of the time."). Modifying adjectives are certainly added for a reason. *See Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir.1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").

Claim 1 could have been drafted to require a "partially translucent" housing or simply a "housing" with a wall that is at least partially translucent. *See Saeilo*, 26 Fed. Appx. at 970. However, claim 1 as originally drafted and as allowed directly refers to the mirror assembly's housing as translucent. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir.1997) ("As between the patentee who

had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.").

Moreover, the housing might not be able to perform its function if it was not completely translucent. Claim 1 specifies that the housing includes a wall that contains and conceals the illuminating image forming means at the closed end. If part of the housing were transparent, for instance, incident light could pass through and the illuminating image forming means would not be concealed.

Taylor argues that DCAG's construction improperly reads in a limitation of "completely translucent" from outside the claim, which is not supported by the specification or the prosecution history. Taylor points to the following language in the specification: "The present invention provides a mirror assembly including a housing having a **translucent portion**, mirror means retained by the housing, and illuminating image forming means mounted within the housing and behind the mirror for projecting an image through the **translucent portion**." '019 patent, col. 1, ll. 50–55 (emphasis added). The Abstract also states that the mirror assembly includes a housing "having a **translucent portion**." *Id.*, Abstract (emphasis added). However, the specification also describes the drawings as follows: "The assembly 10 includes a translucent housing generally indicated at 12. The housing is constructed from a translucent material, such as a hard plastic." *Id.*, col. 2, ll. 8–10.

Just as it is improper to read in a limitation from outside the claims of a patent, it is improper to read an express limitation out of a claim "because 'courts can neither broaden nor narrow claims to give the patentee something different than

what he has set forth.'" *Texas Instruments v. United States ITC*, 988 F.2d 1165, 1171 (Fed.Cir.1993) (citing *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 396 (1967)). Interpreting a "translucent housing" to mean a "partially translucent housing" would effectively read out the "translucent" limitation from claim 1.

The prosecution history [9] of the '019 patent supports this interpretation and fairly read establishes that the claim language and specification are not conflicting. Claim 1 as filed read (emphasis added):

1. A mirror assembly (10) comprising: a translucent housing (12) having a **translucent portion**; mirror means (20) retained by said housing (12); and illuminating image forming means (26) mounted within said housing (12) and behind said mirror means (20) for pro-jecting an image through said **translucent portion** of said housing (12).

The claim was initially rejected under 35 U.S.C. § 103 as being unpatentable over Dawe (Great Britain Patent No. 271,917) in view of Costello (U.S. Patent No. 1,608,-548) or Marshall (U.S. Patent No. 1,954,-740). Dawe covers a mirror assembly with an opaque screen at the front end. Parts of the screen are cut out into "portions wholly or partly translucent to provide indicating marks for a plurality of indications." Dawe, col. 1, II. 24–26. Behind the screen are individually partitioned lamps for projecting an image through the cut out parts of the screen. *Id.*, col. 1, II. 26–43. In the preferred embodiment, a glass cover is placed in front of the screen. *Id.*, col. 2, II. 76–78. Figure 2 of Dawe is a front view of the device showing the cut out opaque screen and partitioned light sources:

Fig.2.

Rejecting claim 1, the examiner stated:

It would have been obvious to one having ordinary skill in the art to substitute a translucent outer housing plate and stencil-type image projecting means as shown by Costello or Marshall for the screen 9 and cover 10 of Dawe. The well known signs of Costello and Marshall have an equivalent display function to the screen of Dawe.

It would have been an obvious design choice to one of ordinary skill in the art

9. The Decision on Claim Construction at 7–13 also contains a discussion of the '019 patent's prosecution history.

to form the housing of Dawe as an integral translucent housing or shell. The use of smoke tinted translucent material would have been an obvious design choice to one of ordinary skill.

On May 2, 1988, an Amendment Under 116 was filed but not entered. It required "translucent housing means ... having a continuous and uninterrupted translucent portion."

The applicant filed an amendment on June 21, 1988 that, among other changes, deleted "having a translucent portion." Claim 1 was amended to read (additions underlined, deleted elements in brackets):

1. A mirror assembly (10) comprising: a translucent housing (12) *including a plastic shell being substantially cup shaped and having an open end and a closed end and a wall extending from said closed end.*

*said wall and said closed end appearing opaque and containing and concealing illuminating image forming means within said housing (12) and preventing incident light from passing therethrough while only revealing an illuminated image through at least one of said wall and closed end projected from the illuminating image forming means* [having a translucent portion];

mirror means (20) retained by said housing (12) *within and adjacent to said open end;* and

illuminating image means (26) mounted within said housing (12) *adjacent at least one of said closed end portion and wall portion* and *completely* behind said mirror means (20) *so as to be hidden from view from outside said housing (12) and mirror means (20)* for projecting only an illuminated image through *at least one of said wall and closed end portion*

[said translucent portion] of said *shell* [housing] (12) *while the remainder of said illuminating image forming means (26) is hidden within said housing (12).*

The applicant stated that claim 1 was amended "to further characterize the invention and more specifically distinguish the invention over the cited prior art." Specifically, the applicant argued that the mirror assembly in claim 1 provides "a clear illuminated image through a translucent shell housing while not illuminating the remainder of the housing" and distinguished Dawe because it uses a stencil and "does not relate to the problem of projecting an image through a dark housing while keeping the remainder of the housing dark."

In a later Office Action rejecting the applicant's claims for indefiniteness, the examiner stated that "claim 1, lines 2–3 already recite that the housing including the shell is translucent."

■ "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed.Cir.1995). The Court must "assess whether a patentee relinquished a particular claim construction based on the totality of the prosecution history, which includes amendments to claims and arguments made to overcome or distinguish references." *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed.Cir. 2002). Taylor cites two instances where the applicant referenced a "translucent portion" in the June 21, 1988 amendment.[10]

Examining the totality of the prosecution history, it is clear that claim 1 does not encompass a housing that is only par-

---

10. *See* June 21, 1988 Preliminary Amendment, at 4 ("project only an illuminated image through the translucent portion of the shell of the housing"), 8 ("projects only an illuminated image to the translucent portion of the shell of the housing").

tially translucent. It is undisputed that the examiner rejected Taylor's claim with a "translucent portion" but allowed the claim with more detailed and narrow language. Moreover, Taylor expressly disclaimed a mirror assembly with "a housing having a central longitudinal portion of a transparent or translucent element and a light source within the housing." '019 patent, col. 1, II. 35–37 (citing U.S. Patent No. 2,595,331 to Calihan et al.); *see* December 16, 1987 Amendment, at 4 ("The Costello patent does not disclose a translucent housing but rather a lens mounted on a light assembly."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed.Cir.2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."). "Translucent housing" has been consistently used to refer to a housing that is completely translucent. "A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'" *Southwall*, 54 F.3d at 1578 (citation omitted).

### 2. Infringement

#### a. Literal Infringement

■ Taylor does not dispute that the DCAG mirror assembly housing is constructed of opaque plastic with a translucent lens mounted in an opening.

DCAG argues that its housing is entirely opaque because the lens is part of the turn-signal assembly, not part of the housing. According to the Court's interpretation of "housing," though, the lens is part of the overall structure that houses the illuminating image forming means and the mirror mechanism. Hence, it is a portion of the housing.

A "translucent housing" is a housing that is entirely translucent, not a housing with merely a translucent portion. Applying this construction to the DCAG mirror assembly, it clearly does not meet the "translucent housing" limitation of claim 1. The DCAG mirror assembly housing is made of opaque plastic with a translucent portion (the lens). The DCAG mirror assembly does not literally infringe the '019 patent.

#### b. Infringement by Equivalents

■ Regarding infringement under the doctrine of equivalents, prosecution history estoppel applies. The June 21, 1988 amendment specifically disclaimed that which is alleged to be infringing-a housing with a translucent portion. Under *Festo,* the Court must first determine whether the amendment in question narrowed the patent's literal scope for a reason related to patentability and then decide whether the amendment "surrender[ed] the particular equivalent in question." *Festo*, 535 U.S. at 736–740, 122 S.Ct. 1831. "Whether or not prosecution history estoppel precludes a particular action for infringement by equivalents is a question of law." *CAE Screenplates*, 224 F.3d at 1319.

Here, the June 21, 1988 amendment deleted "having a translucent portion" and replaced it with more specific, narrower language. Taylor's argument that the amendment did not relinquish a housing with a translucent portion is belied by the amended language itself.[11] *See York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed.Cir.1996) ("Unless altering claim language to escape

---

11. Taylor also says that because infringement by equivalents is determined on an element-by-element basis, *Warner–Jenkinson*, 52 U.S. at 40, 11 How. 33, and "translucent housing" was never amended during prosecution, prosecution history estoppel does not apply. Although "translucent housing" was never changed, the applicant amended the later

an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage."). As stated by the applicant, claim 1 was amended to "more specifically distinguish the invention over the cited prior art," specifically Dawe in view of Costello or Marshall. The applicant stated that even combining all three references, "one would still have an open ended housing covered by a[n opaque] stencil and a glass." Such a housing would be translucent in part and opaque in part. Accordingly, Taylor cannot claim now that a housing with only a translucent portion infringes claim 1 under the doctrine of equivalents. *See Festo*, 535 U.S. at 733, 122 S.Ct. 1831 (patentee cannot invoke the doctrine of equivalents when he "originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection"); *Festo*, 344 F.3d at 1369–70 (three rebuttal categories not available when the "amendment [was] made to avoid prior art that contains the equivalent in question"); *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed.Cir.2003) ("given the equivalent's presence in the prior art cited against the patentee during prosecution, there can be no other reason the patentee could not have described the substitute in question").

### B. "Closed End"

#### 1. Claim Construction Redux

■ In construing "wall extending from said closed end," the Court stated:

"Open end" and "closed end" are not structural elements but rather the orien-

tation of the described structure: a "translucent housing." The "wall extending from the closed end" is clearly the forward facing portion of the closed end of the housing and is shown on the drawings as 14.[12]

The specification confirms this interpretation of claim 1: "The housing is aerodynamically designed having a closed forwardly facing portion 14 and an open rearwardly facing portion 16." '019 patent, col. 2, II. 13–15. Hence, "closed end" refers to the forward facing portion of the translucent housing, while "open end" refers to the opposite end with the mirror means.

#### 2. Infringement

■ DCAG says that its mirror assembly has two open ends instead of an "open end" and a "closed end." DCAG says that the lens is installed in an opening in the opaque plastic portion of the housing. Consequently, the front of the housing is "open" rather than "closed." DCAG's argument, however, conflicts with the previous interpretation of claim 1 that "closed end" refers to orientation and not structure. The DCAG mirror assembly is substantially cup shaped, therefore it must have a forward facing portion and a rearward facing portion. The forward facing portion of the housing is partially opaque and partially translucent (the lens), while the rearward facing portion retains the mirror means.

The DCAG mirror assembly literally embodies the "closed end" limitation.

statement of what the housing included. The original claim required "a translucent housing (12) having a translucent portion," while the amended claim requires "a translucent housing (12) including a plastic shell being substantially cup shaped" where the closed end contains and conceals the illuminating image forming means. The applicant added

limitations to more narrowly describe the "translucent housing" so that claim 1 would be allowed and, by doing so, surrendered a housing with only a translucent portion. Prosecution history estoppel therefore applies.

**12.** *See* Decision on Claim Construction (August 21, 2003), at 15.

### C. "Containing and Concealing," "Preventing Incident Light from Passing Therethrough," and "Hidden from View"

#### 1. Claim Construction Redux

Claim 1 of the '019 patent requires in part (emphasis added):

said wall and said closed end and **containing and concealing** illuminating image forming means within said housing (12) and **preventing incident light from passing therethrough** while only revealing an illuminated image through at least one of said well and closed end projected from the illuminating image forming means;

. . . . .

said illuminating image forming means (26) mounted within said housing (12) adjacent at least one of said closed end and wall and completely behind said mirror means (20) so as to be hidden from view from outside said housing (12) and said mirror means (20) for projecting only said illuminated image through at least one of said wall and closed end of said shell (12).

The specification further explains these limitations:

Unlike prior art assemblies wherein a light is disposed within the mirror housing and an image forming means is formed integral with the housing or from the housing, the present invention provides both the illuminator and the image forming means totally housed within the housing. The illuminated image is then projected through the translucent housing 12, as shown in FIG. 2. **When the illuminating image forming means 26 is not illuminated, the image forming means 26 is not illuminated, the image is not seen through the housing, and only the darkened housing appears, as in FIG. 2. Hence, there is no indication of the image forming means when not illuminated.** The illuminating image forming means 26 is only apparent when illuminated, as shown in FIG. 1.

*Id.*, col. 2, ll. 33–47 (emphasis added).

 "Claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.Cir.2003); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998) ("the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). Because there is nothing in the '019 patent specification or prosecution history to indicate that the applicant intended anything other than the ordinary meaning of these terms and the terms are not ambiguous, they do not require further interpretation to determine if the DCAG mirror assembly infringes the '019 patent. Claim 1 requires a wall and closed end that contain and conceal illuminating image forming means within the housing and prevent incident light from passing therethrough. The illuminating image forming means is mounted within the housing adjacent to the wall and closed end and behind the mirror means so that it is hidden from view from outside the housing.

The parties agree that "incident light" is used according to its ordinary meaning. It refers to light that is coming from outside the housing toward the housing.

#### 2. Infringement

##### a. Literal Infringement

 It is undisputed that light passes both ways through the lens of the DCAG mirror assembly.

Taylor argues that claim 1 recites that the wall and closed end prevent "incident" light, not just light, from passing through the housing. Taylor says:

Obviously, some light (such as that emitted by the LEDs) will pass through the translucent housing, which is the idea of the invention. It is "incident" light that is prevented from passing through. Taylor's expert, Dr. McDonald, testified that light passes through the plastic lens [of the DCAG mirror assembly], but never said that incident light passes through the wall and closed end. He was never asked that question.

Taylor's expert, Dr. Alan T. McDonald, stated at his deposition:

Q: Does light coming from outside of these mirror assemblies pass through the outer plastic portion of what we're calling the stripe?

A: I'm sure that it can.

Q: Does it pass through to the LEDs?

A: That I'm not sure of.

Q: Light from the LEDs passes out, correct?

A: It does.

Dr. McDonald later said that the LEDs in the DCAG mirror assembly could not be seen when they are not illuminated.

Taylor's position is not well taken. The DCAG mirror assembly is constructed of opaque plastic with a translucent lens mounted in an opening. It is undisputed that light passes **both ways** through the lens. Some light passing through the lens must be "incident," as that term has been defined by the parties. Specifically, some amount of light rays come from outside the DCAG mirror assembly housing toward the housing and pass through the lens of the housing.

Indeed, Dr. McDonald confirmed that light coming from outside can pass through the lens. As the lens is part of the wall at the closed end, which Taylor admits in his papers and Dr. McDonald admitted at his deposition, light coming from outside clearly passes through the wall and closed end in the DCAG mirror assembly. Accordingly, the DCAG mirror assembly does not prevent incident light from passing through the wall and closed end as required by claim 1.

The exhibits support this conclusion.[13] Attached Exhibit 1 is a front view photograph of the DCAG mirror assembly. Component A is the opaque plastic portion of the housing. Component B is the translucent lens. Component C is a "translucent plastic piece with circular designs" that is placed behind the translucent lens. DCAG calls this piece a "Fresnel lense" and says that it is also used in U.S. Patent No. 6,139,171 assigned to Reitter & Schefenacker GmbH & Co. KG. Attached Exhibit 2 is a photograph of the DCAG mirror assembly when unassembled. Component E is a circuit board with multiple LEDs that is placed behind component C. Component F is a rubber gasket used to mount the circuit board within the housing.

Attached Exhibit 3 is a photograph of the DCAG mirror assembly with the illuminating image forming means installed within the housing but not activated. Attached Exhibit 4 is a photograph of the DCAG mirror assembly with the illuminating image forming means removed.[14] It is well known that in order for the human

---

**13.** Subsequent to the hearing, the Court requested that DCAG lodge with the Court a list of all the component parts of the DCAG mirror assembly, along with the specific function of each component part. Both parties then submitted additional papers and exhibits.

**14.** The "illuminating image forming means" that is installed in Exhibit 3 but removed in

Exhibit 4 is the circuit board with LEDs (component E in Exhibit 2). There is some confusion over whether the "translucent plastic piece with circular designs" (component C in Exhibit 1) is also a part of the "illuminating image forming means" structure in the DCAG mirror assembly. Taylor says that it is not; it is part of the housing because it prevents

eye to perceive an illuminated object, light rays must hit the surface of the object and be reflected back to the eye. Hence, if the DCAG mirror assembly prevented incident light from passing through the wall and hitting the illuminating image forming means, the two photographs would look the same. However, they clearly do not. The translucent portion of the housing appears white in Exhibit 3 but dark in Exhibit 4.[15] No rational trier of fact could find otherwise. Thus, the DCAG mirror assembly does not meet the claim 1 limitation of "preventing incident light from passing therethrough" and there is no literal infringement of claim 1.

Taylor says that in the photographs referenced above, only the "translucent plastic piece with circular designs" is visible, not the circuit board with LEDs. However, if only that piece and not the LEDs were visible, Exhibit 3 and Exhibit 4 would look the same. Because they do not, incident light must pass through the housing and the illuminating image forming means is not hidden from view.

Claim 1 requires that the wall and closed end "contain[ ] and conceal[ ]" the illuminating image forming means within the housing so that the illuminating image forming means, mounted behind the mirror, is "hidden from view" from outside the housing. The specification explains that when the illuminating image forming means is not illuminated, "the image is not seen through the housing, and only the darkened housing appears, as in FIG. 2. Hence, there is no indication of the image forming means when not illuminated." '019 patent, col. 2, ll. 42–45.

DCAG points to Dr. McDonald's admission that the physical portion of the lens that is flush with the surface of the housing on the DCAG mirror assembly is visible regardless of whether the illuminating image forming means is activated. The visibility of the lens itself, though, has nothing to do with whether the illuminating image forming means is concealed and "hidden from view."

However, it is readily apparent from the photographs referenced above that the DCAG mirror assembly appears different if the unactivated illuminating image forming means is removed. Accordingly, there is at least some indication of the illuminating image forming means in the DCAG mirror assembly when it is not illuminated; the illuminating image forming means is not "hidden from view." There is no literal infringement.

#### b. Infringement by Equivalents

▮ Prosecution history estoppel also applies to the three limitations discussed above, preventing Taylor from asserting infringement under the doctrine of equivalents. The June 21, 1988 amendment added the three limitations to claim 1 to overcome Dawe, which disclosed a glass cover

---

incident light from passing through to the LEDs. However, as previously stated, the "housing" is the outer shell that contains the illuminating image forming means inside it and connects to the mirror mechanism at the open end. In the DCAG mirror assembly, it is comprised of an opaque portion and a translucent portion (the lens). The "translucent plastic piece with circular designs" is placed behind the lens. It is contained by the outer shell, not part of the outer shell, and functions to bend and focus the light rays emitted from the LEDs. Hence, it is more appropriately categorized as structure corresponding to "illuminating image forming means." Regardless of whether the "translucent plastic piece with circular designs" is part of the "housing" or part of the "illuminating image forming means" in the DCAG mirror assembly, though, Exhibits 3 and 4 are appropriate for comparison because at least part of the "illuminating image forming means" is present in Exhibit 3 and absent in Exhibit 4.

15. Attached Exhibit 5 is a photograph of the DCAG mirror assembly with the illuminating image forming means installed and activated.

over an opaque stencil and a set of light sources. Specifically, the applicant stated (emphasis added):

> If one was to combine the Dawe patent with the Marshall and C[o]stello patents one would still have an open ended housing covered by a stencil and a glass such that **one could see through the glass and see the image forming means** whether the light is on or off.

As detailed in the specification, the mirror assembly of claim 1 is different from the prior art because "[w]hen the illuminating image forming means 26 is not illuminated, ... the image is not seen through the housing, and only the darkened housing appears." *Id.*, col. 2, II. 40–43. By distinguishing the invention over the Dawe prior art, the applicant surrendered protection of a housing that allows incident light to pass through and does not keep the illuminating image forming means hidden from view when not illuminated.

Taylor argues that the June 21, 1988 amendment was not an unmistakable sur-render of subject matter for claim coverage. Again, however, claim 1 was narrowed to "more specifically distinguish the invention over the cited prior art." *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1355 (Fed.Cir.1998) (patentee's "boilerplate remark to the examiner that he amended his claims to 'specifically and expressly recite the structural details' of his invention does not affect our conclusion" that prosecution history estoppel applies). Taylor is estopped from claiming now that a housing allowing incident light to pass through and not concealing the illuminating image forming means from view infringes claim 1 under the doctrine of equivalents.

## V. Conclusion

The DCAG mirror assembly does not literally infringe claim 1 of the '019 patent and prosecution history estoppel prevents Taylor from asserting infringement under the doctrine of equivalents.[16]

SO ORDERED.

16. The Court will enter a final judgment unless either party files an objection within five days.